**Ter YANG, also known as Ricky Yang, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**Elizardo TERRAZAS–GARCIA, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**Dimitrios KATSOULIS, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**Jelica BICANIN, also known as Jelica Murati, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

Nos. 94–3071, 95–3665, 96–1824 and 96–2044.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 24, 1997.

Decided March 18, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied in Nos. 95–3665, 96–1824, 96–2044 May 14, 1997.*

---

* Judge Flaum took no part in the consideration of the petition for rehearing en banc.

dall, Jr., David M. McConnell, Michelle Gluck, Department of Justice, Civil Division, Immigration Litigation, David J. Kline, Department of Justice, Office of Immigration Litigation, Washington, DC, for Immigration and Naturalization Service in No. 94-3071.

Javier H. Rubinstein, Mayer, Brown & Platt, Chicago, Il, Lisa Scott, Mark S. Davidson, Davidson & Scott, Chicago, IL, for Elizardo Terrazas–Garcia.

Janet Reno, U.S. Attorney General, Washington, DC, Tom Schroeder, Immigration & Naturalization Service, Chicago, IL, Richard M. Evans, William J. Howard, David M. McConnell, Stephen W. Funk, Marion E. Guyton, Quynh Vu, Department of Justice, Civil Division, Immigration Litigation, Kristal Marlow, F. Franklin Amanat (argued), Department of Justice, Office of Immigration Litigation, Washington, DC, for Immigration and Naturalization Service in No. 95–3665.

Javier H. Rubinstein, Mayer, Brown & Platt, Chicago, IL, Scott D. Pollock, Pollock & Associates, Chicago, IL, for Dimitrios Katsoulis.

David V. Bernal, Department of Justice, Office of Immigration Litigation, Washington, DC, Samuel Der–Yeghiayan, Immigration & Naturalization Service, Chicago, IL, F. Franklin Amanat (argued), Papu Sandhu, Department of Justice, Office of Immigration Litigation, Washington, DC, for Immigration and Naturalization Service in No. 96–1824.

Javier H. Rubinstein (argued), Mayer, Brown & Platt, Chicago, IL, Stanley J. Horn, Horn & Villasuso, Chicago, IL, for Jelica Bicanin.

Samuel Der–Yeghiayan, Immigration & Naturalization Service, Chicago, IL, Joan E. Smiley, Stephen W. Funk, F. Franklin Amanat (argued), Frank W. Hunger, Asst. Attorney General, Quynh Vu, Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Immigration and Naturalization Service in No. 96–2044.

David D. Cook, Monroe, WI, for Ter Yang.

Janet Reno, U.S. Attorney General, Washington, DC, Samuel Der–Yeghiayan, Immigration & Naturalization Service, Chicago, IL, James B. Burns, Office of the United States Attorney, Chicago, IL, Richard M. Evans, Kristal Marlow (argued), Robert Ken-

Before CUMMINGS, EASTERBROOK, and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

These deportation cases pose questions about the meaning and constitutionality of parts of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, 110 Stat. 1214 (Apr. 24, 1996), and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRA), Division C of Pub.L. 104–208, 110 Stat. 3009 (Sept. 30, 1996). The IIRA rewrote the rules for both deportation (renamed "removal") and judicial review, but most of its rules apply only to proceedings commenced on or after April 1, 1997. See *INS v. Yueh–Shaio Yang*, —— U.S. ——, —— n. 1, 117 S.Ct. 350, 352 n. 1, 136 L.Ed.2d 288 (1996); *Lalani v. Perryman*, 105 F.3d 334, 335–37 (7th Cir. 1997). For earlier proceedings the former law, as modified by the AEDPA, applies. Under this body of law, a final order of deportation is reviewable in the court of appeals, but with an exception created by § 440(a) of the AEDPA (as amended by § 306(d) of the IIRA), amending § 106(a)(10) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1105a(a)(10):

> Any final order of deportation against an alien who is deportable by reason of having committed a criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(i), shall not be subject to review by any court.

Section 241 is codified as 8 U.S.C. § 1251. The pertinent portions of this law, including an amendment made by § 435(a) of the AEDPA, read:

> (a) Any alien (including an alien crewman) in the United States shall, upon the order of the Attorney General, be deported if the alien is within one or more of the following classes of deportable aliens: ...
>
> (2) Criminal offenses.
>
> (A) General crimes.
>
> (i) Crimes of moral turpitude. Any alien who—
>
> (I) is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under section 245(i) [8 U.S.C. § 1255(i) ]) after the date of entry, and
>
> (II) is convicted of a crime for which a sentence of one year or longer may be imposed,
>
> is deportable.
>
> (ii) Multiple criminal convictions. Any alien who at any time after entry is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.
>
> (iii) Aggravated felony. Any alien who is convicted of an aggravated felony at any time after entry is deportable.
>
> (iv) Waiver authorized. Clauses (i), (ii), and (iii) shall not apply in the case of an alien with respect to a criminal conviction if the alien subsequent to the criminal conviction has been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States.
>
> (B) Controlled substances.
>
> (i) Conviction. Any alien who at any time after entry has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802)), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.
>
> (ii) Drug abusers and addicts. Any alien who is, or at any time after entry has been, a drug abuser or addict is deportable.
>
> (C) Certain firearm offenses. Any alien who at any time after entry is convicted under any law of purchas-

ing, selling, offering for sale, exchanging, using, owning, possessing, or carrying, or of attempting or conspiring to purchase, sell, offer for sale, exchange, use, own, possess, or carry, any weapon, part, or accessory which is a firearm or destructive device (as defined in section 921(a) of title 18, United States Code) in violation of any law is deportable.

(D) Miscellaneous crimes. Any alien who at any time has been convicted (the judgment on such conviction becoming final) of, or has been so convicted of a conspiracy or attempt to violate—

(i) any offense under chapter 37 [18 U.S.C. § 792 et seq.] (relating to espionage), chapter 105 [18 U.S.C. § 2151 et seq.] (relating to sabotage), or chapter 115 [18 U.S.C. § 2381 et seq.] (relating to treason and sedition) of title 18, United States Code, for which a term of imprisonment of five or more years may be imposed;

(ii) any offense under section 871 or 960 of title 18, United States Code;

(iii) a violation of any provision of the Military Selective Service Act (50 U.S.C.App. § 451 et seq.) or the Trading With the Enemy Act (50 U.S.C.App. § 1 et seq.); or

(iv) a violation of section 215 or 278 of this Act [8 U.S.C. § 1185 or § 1328], is deportable.

We must decide whether, and if so how, these rules apply to four aliens who have been ordered deported following the commission of crimes.

## I

Ter Yang came to the United States as a refugee with his family in 1980, when he was five years old. This Hmong family was in flight from chaos and persecution in Laos. Alas, arrival in the New World did not end its troubles. Ter Yang took up with a gang and began a life of crime. Two of his crimes led to convictions. (1) Members of the gang broke into a pawn shop and stole 23 pistols, apparently for use in gang activities. Yang pleaded guilty to being a party to the crime of burglary and was sentenced to an indeterminate term of not more than 10 years' imprisonment. (2) The Yang family's garage became a depot for the gang's loot. A search of this garage turned up stolen items, including a gun burgled from a second pawn shop. Yang was convicted of concealing stolen firearms and was sentenced to five years' probation; this crime, a Class D felony in Wisconsin, had a maximum punishment of five years' imprisonment. The immigration judge ordered Yang deported under § 241(a)(2)(A)(ii), because both offenses are "crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct", and under § 241(a)(2)(C), because concealing the pilfered gun equates to "possessing" a firearm. The judge also concluded that Yang is ineligible for asylum because the theft of weapons is a "particularly serious crime" (see 8 U.S.C. § 1253(h)(2); 8 C.F.R. § 208.14(c)) and is ineligible for discretionary relief under § 212(c), 8 U.S.C. § 1182(c), because there is no ground of exclusion comparable to the § 241(a)(2)(C) ground of deportation. See *Leal–Rodriguez v. INS*, 990 F.2d 939, 949 (7th Cir.1993). Having contested deportation under § 241(a)(2)(A)(ii) before the immigration judge, Yang dropped that contention on appeal to the Board of Immigration Appeals. Although he renewed his argument that the burglary was not a "particularly serious crime," the BIA disagreed. The Board also held Yang ineligible for other relief, for essentially the reasons the immigration judge gave. In this court Yang argues that he is entitled to apply for asylum because the burglary was not a "particularly serious crime"; that he is not deportable under § 241(a)(2)(C) because concealing a firearm does not imply possessing it; and that even if he is deportable under both § 241(a)(2)(A)(ii) and § 241(a)(2)(C) he is entitled to seek discretionary relief under § 212(c).

Elizardo Terrazas–Garcia entered the United States from Mexico in 1962, when he was 16, as a lawful permanent resident. He has six children, all of whom are U.S. citizens. Between 1980 and 1988 (perhaps 1990), Terrazas–Garcia was a full-time drug

dealer. His convictions for possession of cocaine and distribution of heroin led to a deportation order based on § 241(a)(2)(A)(iii), the aggravated-felony provision. Terrazas–Garcia concedes that he is deportable under this section but wants to remain in the United States. For this he needs a favorable exercise of discretion under § 212(c). The immigration judge and then the BIA held that Terrazas–Garcia does not deserve this boon. In this court Terrazas–Garcia argues that the Board abused its discretion because it did not fully discuss evidence that he has been rehabilitated since 1990, and that his long residence before he took up crime, and large family, are "unusual or outstanding equities" justifying relief from deportation.

Dimitrios Katsoulis came to the United States from Greece in 1972, when he was 10. His criminal record began in 1987 with a conviction for burglary of an automobile. He was sentenced to probation, which did not work. In 1988 he pleaded guilty to possession of marijuana and was again given a non-custodial sentence. In 1991 he pleaded guilty to possession of cocaine, with intent to distribute that drug, and to distribution of heroin on a separate occasion. These convictions led to a term of three years' probation, and again no confinement. Continued involvement with drugs led supervisory officials to threaten revocation of the probation, but nothing happened. In January 1993 Katsoulis pleaded guilty to possession of cocaine and was sentenced to three years' incarceration. He served less than a year, but the INS got wind of his troubles with the law and commenced deportation proceedings. The immigration judge and BIA found him deportable under § 241(a)(2)(B)(i), the controlled-substance provision, and denied his request for relief under § 212(c). In this court Katsoulis argues that the Board abused its discretion because it did not fully discuss evidence that he has been rehabilitated and that he has close ties to his family, which he submits are "unusual or outstanding equities" justifying relief from deportation.

Jelica Bicanin entered the United States from Yugoslavia as a visitor in 1981, when she was 34, and acquired permanent resident status in 1983 following her marriage to a U.S. citizen. In 1991 she pleaded *nolo contendere* to a cocaine offense and served eight months' imprisonment plus a term in a halfway house. She was ordered deported under both § 241(a)(2)(A)(iii) (aggravated felony) and § 241(a)(2)(B)(i) (controlled-substance violation). Bicanin's application for relief under § 212(c) was denied by both the immigration judge and the BIA, which did not find the equities in her favor sufficient: "[R]espondent has been convicted for shoplifting [in addition to the drug crime]. We also note that the respondent did not become a lawful permanent resident of the United States until she was well into her adult years … and has substantial family ties to the former Republic of Yugoslavia, where her husband, three of her four children, mother, and six of her eight siblings reside." Bicanin argues in this court that the Board abused its discretion in concluding that she has not shown the "outstanding equities" required to justify relief from deportation.

## II

All four petitioners were ordered deported following concessions or conclusions that they committed crimes within the scope of § 241(a)(2). The INS therefore asks us to dismiss all four petitions on the authority of the current version of § 106(a)(10). Petitioners' first response is that the changes do not apply to deportation proceedings commenced before April 24, 1996.

Section 440(a) of the AEDPA does not have an effective date, but because it curtails the jurisdiction of the courts it is presumptively effective on enactment. *Landgraf v. USI Film Products*, 511 U.S. 244, 274, 114 S.Ct. 1483, 1501–02, 128 L.Ed.2d 229 (1994); *Bruner v. United States*, 343 U.S. 112, 116–17, 72 S.Ct. 581, 584–85, 96 L.Ed. 786 (1952); *Kline v. Burke Construction Co.*, 260 U.S. 226, 234, 43 S.Ct. 79, 82–83, 67 L.Ed. 226 (1922); *Gwin v. United States*, 184 U.S. 669, 675, 22 S.Ct. 526, 529, 46 L.Ed. 741 (1902). Every court of appeals that has considered the question has held that the current version of § 106(a)(10) applies to pending cases. See *Kolster v. INS*, 101 F.3d 785 (1st Cir.1996); *Hincapie–Nieto*

*v. INS,* 92 F.3d 27 (2d Cir.1996); *Salazar–Haro v. INS,* 95 F.3d 309 (3d Cir.1996); *Mendez–Rosas v. INS,* 87 F.3d 672 (5th Cir. 1996); *Qasguargis v. INS,* 91 F.3d 788 (6th Cir.1996); *Duldulao v. INS,* 90 F.3d 396 (9th Cir.1996); *Boston–Bollers v. INS,* 106 F.3d 352, (11th Cir.1997). This conclusion is fortified by the differences between the AEDPA and the IIRA. The latter statute provides for deferred application, an approach that contrasts with the one taken in the AEDPA. It is difficult to avoid the conclusion that the AEDPA covers all cases now in the administrative and judicial pipelines, while the IIRA covers removal proceedings begun during or after this coming April.

*Reyes–Hernandez v. INS,* 89 F.3d 490 (7th Cir.1996), holds that the changes made by § 440(a) of the AEDPA do not apply to aliens who may have surrendered rights under the law in force at the time, only to learn that this step—costless or even beneficial when taken—has unexpectedly closed the doors of the federal court to the review of their principal claims. Cf. *Burris v. Parke,* 95 F.3d 465 (7th Cir.1996) (en banc) (similar conclusion for another provision of the AEDPA). We were particularly concerned about the possibility that an alien might concede deportability, despite a colorable defense, in order to expedite a request for relief under § 212(c), only to have the concession wipe out jurisdiction under the amended § 106(a)(10).

Several courts have disagreed with *Reyes–Hernandez.* See *Kolster,* 101 F.3d at 789; *Salazar–Haro,* 95 F.3d at 311; *Hincapie–Nieto,* 92 F.3d at 30. These courts observe that a concession of deportability does not facilitate or expedite a claim for discretionary relief under § 212(c). To the contrary, as Yang's case vividly shows, the concession complicates, and sometimes forecloses, that possibility. The second circuit expressed skepticism "that any alien concedes deportability only because of the expected possibility of section 212(c) relief and the availability of a petition for review of the denial of such relief. It is far more likely that deportability is conceded because there is no conceivable defense available." *Hincapie–Nieto,* 92 F.3d at 30.

That much was plain in *Reyes–Hernandez* itself. We observed that unless the alien had a colorable defense to deportability under § 241(a)(2), the concession of deportability was costless and could not be characterized as a tactical decision gone awry in light of the statutory amendment. *Arevalo–Lopez v. INS,* 104 F.3d 100 (7th Cir. 1997), converted this reservation to a holding, dismissing a petition for review, on the authority of § 106(a)(10), after concluding that the alien did not have a colorable defense to deportation. Terrazas–Garcia, Katsoulis, and Bicanin concede that they lack a colorable defense to deportation, and that under *Arevalo–Lopez* the amended § 106(a)(10) applies. They ask us to overrule *Arevalo–Lopez,* but we are not inclined to do so. *Reyes–Hernandez* is a decision with a limited domain, as *Arevalo–Lopez* properly recognizes—a domain that it would be inappropriate to expand, given the force of precedent in other circuits.

■ Only Yang attempts to use the safe harbor recognized in *Reyes–Hernandez.* He contends that he is not deportable under § 241(a)(2)(C), because concealing the gun in the family garage differs from "possessing" a firearm. This is certainly a colorable defense to deportation under § 241(a)(2)(C). But Yang's problem is that he is unable to demonstrate how the change of law pulled the rug out from under his litigating strategy. Such a demonstration is essential—or so we have held when deciding what other provisions of the AEDPA apply to pending cases. See *Lindh v. Murphy,* 96 F.3d 856 (7th Cir.1996) (en banc), cert. granted, —— U.S. ——, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997); *Roldan v. United States,* 96 F.3d 1013 (7th Cir.1996). Yang has not been mouse-trapped. True enough, he did not make the § 241(a)(2)(C) argument to the immigration judge, but this was not part of a plan to facilitate a plea for discretionary relief. To the contrary, under the Board's precedent (and the law of this circuit, see *Leal–Rodriguez* ) the concession *foreclosed* relief under § 212(c). Being behind the eight ball cannot be attributed to the AEDPA. What is more, although Yang conceded deportability before the BIA under

§ 241(a)(2)(A)(ii), he had resisted this theory before the immigration judge; again he did not drop an objection in order to set up a claim for relief, for the finding of deportability under § 241(a)(2)(A)(ii), coupled with the Board's view that theft of guns is a "particularly serious crime", extinguished the possibility of asylum.

### III

■ Three of the petitioners acknowledge that if the current version of § 106(a)(10) applies (as we have just held) and is constitutional (the subject of Part IV below), then their petitions must be dismissed for want of jurisdiction. Again Yang is the exception. He denies that he is deportable under § 241(a)(2)(C), and before the immigration judge he denied that he was deportable under § 241(a)(2)(A)(ii). May he renew these arguments, in order to persuade us that judicial review is permissible despite § 106(a)(10)?

The Department of Justice is of two minds about this question. Counsel in three of these four cases firmly answered "no." On this view, if the BIA states that a person is an alien deportable for a listed reason, the court lacks jurisdiction. The competing understanding, advanced by the Department's lawyer in the fourth case, is that the court may (indeed, must) determine for itself whether the petitioner is (i) an alien (ii) deportable (iii) by reason of a criminal offense listed in the statute. When addressing these issues, this lawyer contended, the court must give the BIA's conclusions appropriate respect, but if even with deferential review the BIA's conclusions cannot be sustained, then § 106(a)(10) falls out of the picture.

■ This latter position has the support of the statutory text. Congress did not say that review is precluded if the Attorney General *finds* that a person is an alien deportable by reason of particular criminal convictions. The statute says that review is unavailable at the behest of "an alien who is deportable by reason of having committed a criminal offense covered in" enumerated sections. There is a big difference. When judicial review depends on a particular fact or legal conclusion, then a court may determine whether that condition exists. The doctrine that a court has jurisdiction to determine whether it has jurisdiction rests on this understanding. *Land v. Dollar*, 330 U.S. 731, 739, 67 S.Ct. 1009, 1013, 91 L.Ed. 1209 (1947). More to the point, *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978), shows that application of a review-preclusion statute does not depend on the agency's findings. The EPA promulgated a regulation it called an "emission standard." A statute limited review of emission standards, but not of other administrative orders, such as work practice rules. The Court held in *Adamo Wrecking* that whether the regulation was indeed an emissions standard was open to review, although the answer "yes" would have foreclosed any further judicial role. Just so here. Whether Yang is an alien deportable by reason of certain crimes is open to review, although the answer "yes" brings proceedings to an end. We think it highly unlikely that Congress meant to enable the Attorney General to expel an alien with a clean record just by stating that the person is a criminal, without any opportunity for judicial review of a claim of mistaken identity or political vendetta. Certainly the text of § 106(a)(10) is consistent with the normal approach reflected in *Adamo Wrecking*, and, as Part IV shows, giving § 106(a)(10) this reading solves a potential constitutional problem.

One caveat is in order. None of the aliens contends that the order of deportation is based on a secret reason. Suppose a future petitioner were to contend that the Attorney General regularly remitted the deportation of criminal aliens who are Christian, but not those who are Moslem. A contention that this had occurred might mean that the order of deportation was not "by reason of having committed a criminal offense" listed in § 241(a)(2), but was by reason of religion. Intrusion of a reason other than a statutorily permissible one might well affect the operation of § 106(a). Cf. *Quackenbush v. Allstate Insurance Co.*, —— U.S. ——, ———–——, 116 S.Ct. 1712, 1718–20, 135 L.Ed.2d 1 (1996); *Czerkies v. Department of Labor*, 73 F.3d 1435 (7th Cir.1996) (en banc). All of the petitioners concede that the reason for de-

portation is the stated one, so we need not explore this question further.

■ According to the BIA, Yang is deportable under § 241(a)(2)(A)(ii) for committing two crimes of moral turpitude. Yang does not contest this ground of deportability; he did contest it before the immigration judge, but he dropped that argument on appeal to the Board and has not sought to revive it. One listed ground of deportation is enough to preclude review of the order, so we could stop here—but Yang filed his appeal to the BIA and his petition for review before Congress enacted the AEDPA, and he filed his brief before the further amendments made by the IIRA. These events potentially alter the consequences of his litigation strategy, and we believe that they relieve him of the consequences that usually attend failures to address issues. That we have the *power* to adjudicate issues relevant to jurisdiction, even those that have not been briefed, cannot be doubted. *Kamen v. Kemper Financial Services Inc.*, 500 U.S. 90, 99, 111 S.Ct. 1711, 1717–18, 114 L.Ed.2d 152 (1991); *Lander Co. v. MMP Investments, Inc.*, 107 F.3d 476, 479–80 (7th Cir.1997). Metamorphosis of the jurisdictional rules make Yang's an appropriate case to exercise that power.

Before the changes made by the IIRA, deportation under § 241(a)(2)(A)(ii) would not have blocked judicial review. Section 440(a) of the AEDPA originally referred to "any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are otherwise covered by section 241(a)(2)(A)(i)". Section 241(a)(2)(A)(i) deals only with crimes committed within 5 or 10 years of entry; Yang's first conviction came 12 years after his entry. The IIRA amended § 440(d) of the AEDPA, and thus § 106(a)(10) of the INA, by adding the phrase "without regard to the date of their commission" after the words "predicate offenses are". As a result, the delay between Yang's entry and his crimes no longer affected the operation of § 106(a)(10). This change made by the IIRA interacts with an amendment the AEDPA made to § 241(a)(2)(A)(i)(II). The old version of this subsection limited deportation to crimes that produced sentences exceeding one year; the

revised version makes any crime of moral turpitude a ground of deportation if "a sentence of one year or longer may be imposed". The change to § 241(a)(2)(A)(i)(II) is prospective: "The amendment made [to this subsection] shall apply to aliens against whom deportation proceedings are initiated after the date of the enactment of this Act." AEDPA § 435(b). Yang was sentenced to 10 years' imprisonment for his first crime, but to probation for the second. Is the prospectivity rule of § 435(b) limited to persons deported *under* § 241(a)(2)(A)(i), or does it affect those ordered deported (as Yang was) under § 242(a)(2)(A)(ii), when the operation of § 106(a)(10) depends on a demonstration that each of the two crimes of moral turpitude is "otherwise covered by section 241(a)(2)(A)(i)"? *Which version* of § 241(a)(2)(A)(i) must "otherwise cover" the crime? *Pichardo v. INS*, 104 F.3d 756 (5th Cir.1997), holds that the original version must cover the crime, and it would not be sensible to create a conflict on such an esoteric question with limited prospective significance. It follows that the crimes-of-moral-turpitude ground for Yang's deportation does not preclude review of the order.

■ Then there is § 241(a)(2)(C), which also could activate § 106(a)(10). But we agree with Yang that the record does not establish that this section applies. Concealing property differs at least in principle from "possessing" it. Yang may have turned his family's garage into a depot for the gang without being able to exercise dominion over its contents—for his comrades in crime might have taken retribution had he removed anything from the garage for his own use. The record of conviction does not establish how much control Yang possessed over the contents of the garage. Because the immigration judge and the BIA based their order on the formal record of conviction, without making an effort to determine whether Yang "possessed" the weapons in the garage, we need not decide whether § 106(a)(10) permits the Board (or the court) to look behind the judgment of conviction—and, if so, how far behind it (to the charging papers, the plea transcript, the record of trial, perhaps to evidence in the deportation proceedings).

**1194**

■ Although we have resolved every debatable point in Yang's favor on the jurisdictional question, he does not fare so well on the merits. One reason, perhaps the only reason, why the record is silent with respect to the details of the concealment crime is that Yang chose not to contest the § 241(a)(2)(C) ground of deportability before the immigration judge. The parties dispute whether Yang "admitted" deportability under § 241(a)(2)(C), but, whether or not he did so, he did not *contest* this ground. (At the hearing Yang intoned "I guess" after questions by the immigration judge such as "Do you admit that you're deportable for that reason?" and statements like "So, we'll show that you're admitting this charge.") The jurisdictional consequences of this omission were unknowable at the time, which is why we have bent over backward in Yang's favor, but the substantive consequences were settled. Someone deportable by reason of a weapons offense is ineligible for relief under § 212(c), because there is no comparable ground of excludability.

■ Now it turns out that commission of multiple crimes of moral turpitude *is* a ground of exclusion, so the conclusion that Yang is deportable for that reason would not independently bar an application for § 212(c) relief. Although it hardly makes sense to say that an alien who commits one firearms crime is ineligible for discretionary relief, while a second crime restores eligibility, the law is full of quirks. We need not pursue this argument, however, because it is clear from the Board's treatment of the moral-turpitude theory that it was not going to exercise discretion in Yang's favor under § 212(c). It called the crimes "particularly serious" and foreclosed even an application for asylum. It hardly seems likely that the Board would have exercised discretion under § 212(c) in Yang's favor, had the Board believed that there was any discretion to exercise.

■ As a rule we may consider, in support of an administrative decision, only those reasons the agency gave. See *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). But that principle is of little force here, for two reasons. First, we have

rescued Yang from his failure to contest deportability under § 241(a)(2)(C). Although this preserves our jurisdiction, Yang's omissions in the administrative process make it impossible to fault the Board for failing to exercise discretion under § 212(c). Second, it is pointless to remand if "it is clear what the agency decision must be." *Rosendo–Ramirez v. INS*, 32 F.3d 1085, 1094 (7th Cir.1994); *Osmani v. INS*, 14 F.3d 13, 15 (7th Cir.1994). Yang is well on his way to becoming ineligible for § 212(c) relief without regard to § 241(a)(2)(C) and the "comparable ground of excludability" criterion.

■ Once an alien has spent five years in prison for an aggravated felony, his eligibility for § 212(c) relief ends. See *Buitrago–Cuesta v. INS*, 7 F.3d 291 (2d Cir. 1993); *In re Ramirez–Somera*, 20 I. & N. Dec. 564 (BIA 1992). Yang has not passed that milestone, but his ten-year sentence means that he may well do so. The BIA is unlikely to ignore the significance of the passage of prison time—or of its own finding that the felonies are so serious that they preclude even the possibility of asylum. In these circumstances a grant of § 212(c) relief, which is supposed to be available more readily than asylum, would border on irrational. Because the Attorney General, and therefore the Board, has substantial discretion to determine that an offense is too serious, and the alien too dangerous, to be the beneficiary of discretionary relief—so *Yueh–Shaio Yang* held, with support in many earlier cases—and because the Board effectively made that decision with respect to Ter Yang, the order of deportation entered against him must be sustained. See *Garcia v. INS*, 7 F.3d 1320, 1323 (7th Cir.1993).

## IV

■ The three remaining petitioners contend that the Constitution entitles them to judicial review, for two reasons: first, that Article III prevents the political branches of government from curtailing the powers of the judicial branch; second, that deportation without any opportunity for judicial review would deprive them of their liberty without due process of law. Four courts of appeals

have addressed and rejected these contentions, although they observe that limited opportunity to apply for a writ of habeas corpus may remain. *Kolster,* 101 F.3d at 790–91; *Salazar–Haro,* 95 F.3d at 311; *Hincapie–Nieto,* 92 F.3d at 30–31; *Duldulao,* 90 F.3d at 399–400 & n. 4. A fifth rejected the constitutional arguments without remarking on the role of habeas corpus. *Boston–Bollers,* 106 F.3d 352, 354–55, Other courts of appeals have rejected constitutional objections *sub silentio.* Petitioners' arguments were presented to the sixth circuit in *Qasguargis,* which dismissed the petition for review without discussing the Constitution. Our prior opinions, *Arevalo–Lopez* and *Reyes–Hernandez,* did not consider constitutional objections to § 106(a)(10)—none was advanced in either case—and the time has arrived to do so. Although the INS contends that petitioners did not present their constitutional arguments in a timely fashion, Terrazas–Garcia filed his petition before Congress enacted the AEDPA. He at least may reply in constitutional terms to the motions to dismiss it.

■ Aliens may seek the writ that Art. I § 9 cl. 2 preserves against suspension. But we are reluctant to place weight on its availability, because the Supreme Court long ago made it clear that this writ does not offer what our petitioners desire: review of discretionary decisions by the political branches of government. See, e.g., *United States ex rel. Vajtauer v. Commissioner of Immigration,* 273 U.S. 103, 106, 47 S.Ct. 302, 304, 71 L.Ed. 560 (1927) ("Deportation without a fair hearing on charges unsupported by any evidence is a denial of due process which may be corrected on habeas corpus. But a want of due process is not established by showing merely that the decision is erroneous."); *United States ex rel. Tisi v. Tod,* 264 U.S. 131, 132, 134, 44 S.Ct. 260, 260, 261, 68 L.Ed. 590 (1924) ("Tisi's claim to be discharged on habeas corpus rests wholly upon the contention that he has been denied due process of law.... [M]ere error, even if it consists in finding an essential fact without adequate supporting evidence, is not a denial of due process of law."). There is a vast gulf between the non-suspendable constitutional writ and the Administrative Procedure Act.

See *Heikkila v. Barber,* 345 U.S. 229, 236, 73 S.Ct. 603, 606–07, 97 L.Ed. 972 (1953); *White v. Henman,* 977 F.2d 292 (7th Cir.1992); *Kramer v. Jenkins,* 803 F.2d 896 (7th Cir. 1986). Similarly, in cases under 28 U.S.C. § 2254, "[a] federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984). See also *Gilmore v. Taylor,* 508 U.S. 333, 342, 344, 113 S.Ct. 2112, 2117–18, 2118–19, 124 L.Ed.2d 306 (1993); *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 479–80, 116 L.Ed.2d 385 (1991); *Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982). Likewise with errors of federal law. See *United States v. Caceres,* 440 U.S. 741, 752, 99 S.Ct. 1465, 1472, 59 L.Ed.2d 733 (1979) (error "by an executive agency in interpreting its own regulations surely does not raise any constitutional concerns"); *Czerkies,* 73 F.3d at 1443 ("The government does not violate the Constitution every time it mistakenly denies a claim for benefits."). As a practical matter, the right to obtain review, in any court, on the theories our petitioners advance is gone. That is the point of the legislation. Congress wanted to expedite the removal of criminal aliens from the United States by eliminating judicial review, not to delay removal by requiring aliens to start the review process in the district court rather than the court of appeals.

Although 28 U.S.C. § 2241 offers an opportunity for collateral attack more expansive than the Great Writ preserved in the constitution, see *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), none of the petitioners has a claim that would be viable under *Accardi.* The immigration judge and the BIA adjudicated all four cases; one should not confuse claims of error (which these four aliens make) with claims that the Attorney General refused to acknowledge the existence of a discretionary power, as in *Accardi.* What is more, effective April 1, 1997, § 306(a) of the IIRA abolishes even review under § 2241, leaving only the constitutional writ, unaided by statute. This provision, to be codified at 8 U.S.C. § 1252(g), reads:

Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action of the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.

For our petitioners, then, the only plausible avenue of review comes via § 106(a). We must decide whether Congress can foreclose that opportunity.

 Just as the Supreme Court many years ago held that an error of law does not support a writ of habeas corpus, so it held that aliens who have lawfully entered the United States are entitled to due process of law before they may be deported or removed. *Landon v. Plasencia*, 459 U.S. 21, 32–33, 103 S.Ct. 321, 329–30, 74 L.Ed.2d 21 (1982) (citing many earlier cases). But nothing in the AEDPA permits ejection by summary proceedings. An alien is entitled to notice of the charges, to present evidence (and confront adverse evidence), with the assistance of counsel, at an evidentiary hearing before an immigration judge, and to appellate review. At the hearing, the burden is on the INS to prove by "clear, unequivocal, and convincing" evidence that the alien is deportable. *Woodby v. INS*, 385 U.S. 276, 286, 87 S.Ct. 483, 488, 17 L.Ed.2d 362 (1966). The fundamental obligations the due process clause places on the government—notice and an opportunity to be heard—have been preserved. See 8 U.S.C. §§ 1252(b), 1252a, 1252b; 8 C.F.R. Part 242. Persons claiming to be citizens are entitled to even more: colorable claims of citizenship must be resolved, in the first instance, by a court rather than an agency. *Ng Fung Ho v. White*, 259 U.S. 276, 284, 42 S.Ct. 492, 495, 66 L.Ed. 938 (1922). Congress has preserved the judicial role established by *Ng Fung Ho*. See 8 U.S.C. § 1105a(a)(5). (The AEDPA does not affect this statute; the IIRA replaces it with a functionally identical provision.) Petitioners do not contend that any of these adjudicatory procedures is constitutionally deficient. Cf. *Johnson v. Robison*, 415 U.S. 361, 366–74, 94 S.Ct. 1160, 1165–69, 39 L.Ed.2d 389 (1974); *Traynor v. Turnage*, 485 U.S. 535, 541–45, 108 S.Ct. 1372, 1378–80, 99 L.Ed.2d 618 (1988); *Marozsan v. United States*, 852 F.2d 1469 (7th Cir.1988) (en banc). Moreover, the amended § 106(a)(10), as we construed it in Part III of this opinion, preserves an independent judicial role in determining whether the alien is deportable. It is only *after* a person has been determined, by agency and court in concert, to be (i) an alien who is (ii) deportable (iii) by reason of serious crimes that jurisdiction ends. Unless the Constitution bestows a right to have Article III judges review an executive decision to implement an established right to deport an alien, § 106(a)(10) must be respected.

 Due process requires more as the stakes, and therefore the costs of error, rise. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Procedures adequate to adjudicate a parking ticket, see *Van Harken v. Chicago*, 103 F.3d 1346 (7th Cir.1997), would not be adequate to adjudicate a claim of right to remain in the United States. For reasons we have already given, however, aliens receive ample protection—trial-type hearings, administrative appeals, and review in an Article III court—of any claim of *right* to remain in this country. They receive the process that the Constitution requires, see *Landon*, 459 U.S. at 33, 103 S.Ct. at 329–30, and more besides.

 All that remains is petitioners' claim that, despite committing crimes that justify deportation, their transgressions should be excused. Does this require an additional layer of review? This question, too, has an answer given by the Supreme Court long ago. "The power to expel aliens, being essentially a power of the political branches of government, the legislative and executive, may be exercised entirely through executive officers, 'with such opportunity for judicial review of their action as Congress may see fit to authorize or permit.' . . . No judicial review is guaranteed by the Constitution." *Carlson v. Landon*, 342 U.S. 524, 537 & n. 28, 72 S.Ct. 525, 533 & n. 28, 96 L.Ed. 547 (1952) (citing *United States ex rel. Turner v. Williams*, 194 U.S. 279, 290–91, 24 S.Ct. 719, 722–23, 48 L.Ed. 979 (1904), and three other cases); see also *Ng Fung Ho*, 259 U.S. at 280, 42 S.Ct. at 493–94 (Congress may de-

cline to provide judicial review of aliens' contentions); *Fong Yue Ting v. United States,* 149 U.S. 698, 713, 13 S.Ct. 1016, 1022, 37 L.Ed. 905 (1893) ("Although Congress might, if it saw fit, authorize the courts to investigate and ascertain the facts ..., yet Congress might intrust the final determination of those facts to an executive officer, and ..., if it did so, his order was due process of law, and no other tribunal, unless expressly authorized by law to do so, was at liberty to reexamine the evidence on which he acted, or to controvert its sufficiency.") These cases are congruent with more recent decisions holding that Congress need not provide judicial review of discretionary administrative dispositions. E.g., *Webster v. Doe,* 486 U.S. 592, 601, 108 S.Ct. 2047, 2052–53, 100 L.Ed.2d 632 (1988) (discretionary decision to discharge employee); *United States v. Erika, Inc.,* 456 U.S. 201, 206–08, 102 S.Ct. 1650, 1653–54, 72 L.Ed.2d 12 (1982) (determination of right to Medicare Part B payments); *United States v. Fausto,* 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) (determination that untenured federal employees will be discharged). See also *Reno v. Catholic Social Services, Inc.,* 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993); *McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991); *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1477–78, 52 L.Ed.2d 50 (1977).

Article III does not add anything to an argument based on the due process clause. The power to establish the inferior federal courts under Article III § 1 permits Congress to determine their jurisdiction. *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 57–60, 67, 102 S.Ct. 2858, 2864–66, 2869, 73 L.Ed.2d 598 (1982) (opinion of Brennan, J.); *Murray's Lessee v. Hoboken Land & Improvement Co.,* 59 U.S. (18 How.) 272, 284, 15 L.Ed. 372 (1855). For the first century of the nation's existence, the inferior courts lacked federal-question jurisdiction; until 1976 the federal-question jurisdiction was restricted by an amount-in-controversy requirement; many potential federal claims remain outside the jurisdiction of the inferior courts, because of sovereign immunity or a statute such as 5 U.S.C. § 701(a)(2) that restricts the scope of jurisdiction-granting statutes. (Section 701(a)(2) forbids review of decisions "committed to agency discretion by law"; see *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).) None of these limitations offends Article III; neither does § 106(a)(10), which, functionally understood, defines a set of decisions committed to agency discretion. See *INS v. Yueh–Shaio Yang,* —— U.S. ——, —— –——, 117 S.Ct. 350, 352–53, 136 L.Ed.2d 288 (calling suspension of deportation an "act of grace" that like a Presidential pardon is extended in "unfettered discretion").

*Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), on which petitioners rely, deals with a different kind of problem: an attempt by the legislature to require a judge to decide a particular case in a particular way, as if Congress were exercising the "judicial Power of the United States". Compare *Plaut,* 514 U.S. at —— –——, 115 S.Ct. at 1452–53, with *Robertson v. Seattle Audubon Society,* 503 U.S. 429, 441, 112 S.Ct. 1407, 1414–15, 118 L.Ed.2d 73 (1992). It has nothing to do with the validity of laws specifying the limits of federal jurisdiction. Unless Article III *compels* Congress to vest in the inferior federal courts as much judicial power as Article III *permits* them to possess—an inconceivable reading of the Constitution—it interposes no obstacle to the amended § 106(a)(10).

Yang's order of deportation is affirmed. The other three petitioners are aliens, deportable by reason of felonies specified in § 241(a)(2). Section 106(a)(10) applies to this case, forecloses judicial review, and comports with constitutional limitations on the authority of the political branches. Their petitions are accordingly dismissed for want of jurisdiction.